# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | | |
|---|---|---|
| GABRIELLE REEVES, | ) | CASE NO. 5:18CV1425 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| NANCY A. BERRYHILL, | ) | |
| Acting Commissioner | ) | |
| of Social Security, | ) | **MEMORANDUM OF OPINION** |
| | ) | **AND ORDER** |
| Defendant. | ) | |

Plaintiff, Gabrielle Reeves ("Plaintiff" or "Reeves"), challenges the final decision of

Defendant, Nancy A. Berryhill,[1] Acting Commissioner of Social Security ("Commissioner"),

denying her applications for Child's Insurance Benefits ("CIB"), a Period of Disability ("POD"),

and Disability Insurance Benefits ("DIB") under Titles II and XVI of the Social Security Act, 42

U.S.C. §§ 416(i), 423, and 1381 *et seq.* ("Act").[2]  This Court has jurisdiction pursuant to 42

U.S.C. § 405(g) and the consent of the parties, pursuant to 28 U.S.C. § 636(c)(2).  For the

reasons set forth below, the Commissioner's final decision is AFFIRMED.

---

[1] On January 23, 2017, Nancy A. Berryhill became the Acting Commissioner of Social
Security.

[2] On December 26, 2018, this matter was stayed due to the lapse of congressional
appropriations funding the federal government. *See* General Order 2018-15. The stay
was thereafter extended pursuant to General Order 2019-1. As the government shutdown
has ended, the stay imposed by General Orders 2018-15 and 2019-1 is hereby lifted.

# I. PROCEDURAL HISTORY

In December 2015, Reeves filed applications for CIB, POD, and DIB, alleging a disability onset date of March 15, 2009 and claiming she was disabled due to bipolar disorder and "social anxiety."  (Transcript ("Tr.") at 12, 132, 322.)  The applications were denied initially and upon reconsideration, and Reeves requested a hearing before an administrative law judge ("ALJ").  (Tr. 12.)

On September 7, 2017, an ALJ held a hearing, during which Reeves, represented by counsel, and an impartial vocational expert ("VE") testified.  (Tr. 26-73.)  On October 12, 2017, the ALJ issued a written decision finding Plaintiff was not disabled.  (Tr. 12-25.)  The ALJ's decision became final on May 8, 2018, when the Appeals Council declined further review.  (Tr. 1-3.)

On June 25, 2018, Reeves filed her Complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 13, 15, 16.)  Reeves asserts the following assignments of error:

> (1)      The ALJ's decision violates SSR 16-3p because it does not properly evaluate the consistency of Reeves's statements.
>
> (2)      The ALJ's decision violates SSR 06-3p because it does not properly evaluate the opinion of the treating professionals at Portage Path Behavioral Health.

(Doc. No. 13.)

## II. EVIDENCE

## A. Personal and Vocational Evidence

Reeves was born in July 1987 and was 21 years-old on her alleged disability onset date, and 30 years old at the time of her administrative hearing, making her a "younger" person under

social security regulations. (Tr. 19.) *See* 20 C.F.R. §§ 404.1563 & 416.963. She has at least a

high school education and is able to communicate in English. (*Id.*) She has no past relevant

work. (*Id.*)

**B.      Relevant Medical Evidence[3]**

Reeves has a long history of mental health problems. On October 20, 2009, she was

admitted for in-patient psychiatric treatment after cutting herself and reporting suicidal thoughts.

(Tr. 393-395.) Hospital records indicate that, on admission, Reeves was depressed and had

"multiple, fairly extensive cuts on her thighs and legs." (Tr. 393.) She reported a history of

depression and self-mutilative behavior, including cutting, whipping, and punching herself. (*Id.*)

On examination, Reeves was undernourished with a blunted affect and depressed, angry, and

anxious mood. (*Id.*) She reported delusional ideations ("she felt like she is being watched and

people are against her") and random auditory hallucinations. (Tr. 393-394.) Her memory was

intact, her intellectual functioning was fair, and her judgment/insight were limited. (Tr. 394.)

While at the hospital, Reeves "tried to make a noose out of a hospital gown, apparently

trying to hang herself." (*Id.*) She also "banged her head against the wall and punched the wall,"

while screaming. (*Id.*) Reeves was hospitalized for six days, during which she received

medication and psychotherapy. (*Id.*) She was diagnosed with major depression, single episode,

severe; and possible borderline personality. (*Id.*) Her Global Assessment of Functioning

("GAF") on admission was 22, and on discharge was 57.[4] (*Id.*) Upon discharge, she "was more

---

[3] The Court's recitation of the medical evidence is not intended to be exhaustive and is
limited to the evidence cited in the parties' Briefs.

[4] The GAF scale reports a clinician's assessment of an individual's overall level
of functioning. An individual's GAF is rated between 0-100, with lower numbers

cooperative, talkative, medication compliant, and . . . free of suicidal ideation." (*Id*.)  Treating provider Hack R. Chung, M.D., noted Reeves' "[p]rognosis for this episode was considered to be very good; however, because of her ongoing depression and a lifetime history of neglect, she has low self-esteem and she is somewhat vulnerable to stressors, and she will need a very well structured outpatient treatment with medication monitoring." (Tr. 395.)

Over a year later, on November 10, 2010, Reeves underwent a psychiatric initial evaluation with Richard Mufson, M.D., at Pan American Behavioral Health Clinic in Pennsylvania, where she was then-residing. (Tr. 456-459.)  She complained of mood swings, anxiety, depression, and fits of anger. (Tr. 456.)  On examination, Dr. Mufson found Reeves was cooperative and oriented to person, place, and time, with good eye contact, appropriate thought content, normal psychomotor activity, intact memory, goal-directed speech, average intelligence, and good insight. (Tr. 458.)  He also, however, noted an anxious, depressed, and angry mood; with irritability and mood swings. (*Id*.)  Dr. Mufson diagnosed bipolar disorder, and assessed a GAF of 35, indicating major impairment in several areas. (*Id*.)

Reeves underwent another psychiatric evaluation with Dr. Mufson a year later, on November 17, 2011. (Tr. 453-455.)  She reported anxiety, "social phobia," and difficulty

---

indicating more severe mental impairments.  A GAF score between 21 and 30 indicates behavior that is considerably influenced by decisions or hallucinations or serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) or inability to function in almost all areas (e.g., stays in bed all day, no job, home, or friends).  A score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. A recent update of the DSM eliminated the GAF scale because of "its conceptual lack of clarity . . . and questionable psychometrics in routine practice."  *See Diagnostic and Statistical Manual of Mental Disorders* (DSM-5) at 16 (American Psychiatric Ass'n, 5th ed., 2013).

focusing. (Tr. 453.) On examination, Dr. Mufson noted Reeves was cooperative and oriented to person, place, and time, with good eye contact, appropriate thought content, adequate attention span, normal psychomotor activity, intact memory, goal-directed speech, above average intelligence, and good insight. (Tr. 453.) He noted an anxious, depressed, and distractive mood; with constricted affect and mood swings. (*Id*.) Dr. Mufson diagnosed bipolar disorder, and assessed a GAF of 45, indicating serious impairment in social or occupational functioning. (*Id*.)

On June 29, 2013, Reeves was again admitted for in-patient psychiatric treatment after she presented with "suicidal ideation with a plan to kill herself by starvation and dehydration while intoxicated." (Tr. 416-418.) She reported feeling overwhelmed, depressed, and hopeless; and stated she had "stopped eating or drinking [for three days], and then went out drinking alcohol with friends." (*Id*.) James Congdon, M.D., noted Reeves had "attempted to gouge her arms with car keys in an attempt to kill herself," and further that she reported three to four previous suicide attempts in the past "by attempting to jump off a cliff, attempting to hang herself, and attempting to overdose." (Tr. 416.) Her GAF score on admission was 10, indicating a persistent danger of severely hurting herself or others or a serious suicidal act with clear expectation of death. (*Id*.)

On examination, Dr. Congdon noted a "poorly groomed female . . . with tremulous motor behavior, thin physical condition, variable rapport, sleepy sensorium, slurred speech, irritable mood, blunted affect, and normal thought process" with poor insight and judgment. (Tr. 417.) Reeves presented with "recent lethal plan and intent to complete suicide, suicidal ideation, plans, urges, and intentions of serious self-harm, family history of suicide and suicide attempts, mood instability, irritability, anxiety, sleep disturbance, alcohol use, financial stress, recent loss of

relationships, lack of social supports, [and] isolation." (*Id.*) She was treated with medication and therapy, after which her "mood improved within the safety and structure of the inpatient unit with interdisciplinary treatment and medication adjustments." (Tr. 418-419.) Reeves was discharged on July 6, 2013, at which time she showed fair judgment, insight and impulse control; normal thought content; and a fair ability to care for herself. (Tr. 419.) She was diagnosed with bipolar disorder, depression, and alcohol abuse; and assessed a GAF on discharge of 55, indicating moderate symptoms. (Tr. 416.)

Shortly thereafter, on July 11, 2013, Reeves returned to Dr. Mufson for a psychiatric re-evaluation. (Tr. 450-452.) Dr. Mufson noted that Reeves had dropped out of treatment for the past year "because of insurance issues." (Tr. 450.) Reeves reported feeling "really aggravated," with a history of aggression, including "wrecking things," throwing things, and hurting herself. (Tr. 450-451.) On examination, Dr. Mufson found Reeves was cooperative and oriented to person, place, and time, with good eye contact, appropriate thought content, adequate attention span, normal psychomotor activity, intact memory, normal and goal-directed speech, average intelligence, and good insight. (Tr. 450-451.) He also noted an anxious, depressed, and angry mood; with constricted and labile affect and mood swings. (*Id.*) Dr. Mufson diagnosed bipolar disorder, and assessed a GAF of 40, indicating major impairment in several areas. (*Id.*) Dr. Mufson increased Reeves' Lamictal dosage, noting Reeves was anxious and "somewhat hyper." (Tr. 452.)

The record reflects Reeves returned to Dr. Mufson on a monthly basis throughout 2014. In January 2014, Dr. Mufson noted "no psychotic symptoms, mood fairly stable for now." (Tr. 443.) The following month, Reeves reported feeling better with Buproprion. (Tr. 441.) In April

2014, Reeves was "manic instead of depressed," prompting Dr. Mufson to adjust her medication. (Tr. 439.)  In May 2014, Reeves reported she had missed an appointment so she decreased her medication in order to "stretch it," but it was still effective.  (Tr. 438.)  In August 2014, she indicated she was had been experiencing a "tendency to get aggressive and agitated," with fluctuating energy levels.  (Tr. 436.)  Nonetheless, Reeves stated her medication was helpful. (*Id.*)

On October 2, 2014, Reeves underwent a psychiatric re-evaluation with Dr. Mufson.  (Tr. 447-449.)  Dr. Mufson noted Reeves was "mostly" compliant with treatment but "had a tendency to miss appointments." (Tr. 447.)  Reeves reported she felt "less depressed."  (*Id.*)  On examination, Dr. Mufson found Reeves was oriented to person, place, and time, with good eye contact, appropriate thought content, adequate attention span, normal psychomotor activity, intact memory, well-articulated speech, average intelligence, and good insight.  (Tr. 447-448.) He also noted a depressed and angry mood; and mood swings.  (*Id.*)  Dr. Mufson diagnosed bipolar disorder, and assessed a GAF of 60, indicating moderate impairment.  (*Id.*)  Several months later, on December 23, 2014, Reeves reported feeling well.  (Tr. 433.)

Reeves continued to present regularly for treatment with Dr. Musfon in 2015.  In February 2015, she complained of racing thoughts.  (Tr. 432.)  In March, Reeves stated the combination of her medications was "working okay."  (Tr. 430.)  In April 2015, Reeves reported "no major changes" and was stable with treatment.  (Tr. 429.)  Examination during that visit showed normal psychomotor activity, cooperative behavior, irritability, and good insight.  (*Id.*) On June 11, 2015, Reeves underwent a psychiatric re-evaluation.  (Tr. 444-446.)  She reported social anxiety and a history of depression, but stated she was "less agitated" with medication and

treatment. (Tr. 444.) On examination, Dr. Mufson found Reeves was cooperative and oriented to person, place, and time, with good eye contact, appropriate thought content, adequate attention span, normal psychomotor activity, intact memory, normal and well-articulated speech, and average intelligence. (*Id.*) He also noted an anxious, depressed, and irritable mood; as well as mood swings. (*Id.*) Dr. Mufson continued to diagnose bipolar disorder, and assessed a GAF of 60, indicating moderate impairment. (Tr. 445.)

In October 2015, Reeves reported: "my medication is working fine; I feel great, and I have no complaints." (Tr. 427.) Examination that date was normal, aside from mood swings and irritability. (*Id.*) The following month, Reeves reported she was doing well with treatment; however, she had missed an appointment and run out of her medication. (Tr. 426.) On examination, Reeves was described as disoriented with mood swings.[5] (*Id.*)

On January 11, 2016, Reeves underwent an psychiatric initial evaluation with Cesar Fabiani, M.D. (Tr. 421-424.) She complained of depression, anxiety, mood swings, and a "short temper." (Tr. 421.) On examination, Dr. Fabiani found Reeves was cooperative and oriented to person, place and time, with appropriate thought content, adequate attention span, normal and well-articulated speech, intact memory, fair insight, good eye contact, and normal average intelligence. (Tr. 423.) He also noted distractive behavior, depressed mood, mood swings,

---

[5] During 2015, Reeves established care with primary care physician James Volpe, D.O. (Tr. 486-488.) She complained of chronic fatigue, bipolar disorder, and an inability to gain weight. (*Id.*) Reeves presented to Dr. Volpe on June 8, 2015; June 29, 2015; August 3, 2015; and August 10, 2015. (Tr. 486-488, 483-485, 480-482, 475-477.) During each of these visits, Dr. Volpe noted Reeves was alert and oriented, with normal speech, appropriate mood and affect, and cooperative behavior. (Tr. 487, 484, 481, 476.)

irritability, delusional ideas, and present suicidal ideas. (*Id*.) Dr. Fabiani diagnosed bipolar disorder, type II. (Tr. 424.)

On February 9, 2016, Reeves reported that she felt a lot better. (Tr. 491.) On examination, Dr. Fabiani noted normal psychomotor activity, auditory hallucinations, cooperative behavior, a depressed and anxious mood, and good insight. (*Id.*) He described Reeves as stable and prescribed Ativan. (*Id.*) The following month, Reeves complained of mood swings. (Tr. 490.) Dr. Fabiani noted depressed mood and "apathetic hesitant" behavior. (*Id.*)

In May 2016, after moving to Ohio, Reeves established treatment at Portage Path Behavioral Health ("PPBH"). (Tr. 558-572.) She indicated that "I'd like to continue seeking help with my issues. Especially to continue my medication regimen. I'm really bad without it. If I'm not taking my medication every day I can really feel a difference." (Tr. 558.) Reeves complained of depression, anxiety, anger/aggression, hallucinations, paranoia, mania/hypomania, and self-injury. (Tr. 560-562.) She described her symptoms, in relevant part, as follows:

> I have very low energy. I focus on a lot of bad memories. I can't concentrate. I can't think straight. I don't want to eat. I just don't want to do anything and you know, crying spells. From there I can get mixed episodes. I get anxious when I'm depressed and it can turn into one of those fits. I've thrown things and done things to myself. * * * I hate myself almost all the time so it's worse then.

(Tr. 560.) Reeves also reported that she worries about everything, causing her to stutter and feel nauseous. (*Id*.) She reported avoiding crowds and crowded places, indicating "I hate hearing people talk, I hate smelling them. People mostly disgust me. Most human beings at large. . . . Being out during the day actually really bothers me." (Tr. 560-561.) Reeves indicated her

temper was triggered by "weird, random things," and stated she "may drink impulsively when people are around." (Tr. 561.) She also described hallucinations, paranoia, and abrupt mood swings during which she throws things, has "wailing fits," and experiences manic episodes lasting as long as a month. (Tr. 561-562.) Finally, Reeves described self-injurious behavior, as follows:

> "I've cut myself for 13 years." The last time she cut herself was in December of 2015. She mainly cuts her thighs, chest, and abdomen. She has also burned herself with matchsticks. She has choked herself to release frustration. She punched herself in the temple and had light sensitivity for three days afterwards. She last punched herself on the jaw on May 4th and had a bruise for a few days.

(Tr. 562.) Reeves reported four previous suicide attempts. (Tr. 563-564.)

On examination, registered nurse Paula Longshore, R.N., noted cooperative behavior, normal speech, appropriate affect, anxious mood, circumstantial thought process, intact memory, adequate concentration, and fair insight/judgment. (Tr. 569.) She diagnosed bipolar I disorder, current or most recent episode depressed, moderate; unspecified anxiety disorder; and borderline personality disorder. (Tr. 571-572.)

On June 7, 2016, Reeves presented to PPBH clinical nurse specialist Kathy Cockfield, PMNCNS with the following complaints:

> Currently she ranges from anger and moodiness, rapid cycling. This can change from hour to hour. She can escalate into violent crying spells and self abuse behaviors, feeling overheated. This may happen about once monthly . . . the Lamictal helped to lessen the intensity of the mood swings. She used to break things. If she is really anxious she might hear her grandmother crying or phone ringing. Currently she has had trouble initiating sleep the past few months. Sometimes even with ambien she cannot sleep due to racing thoughts.

(Tr. 553.) Reeves reported her medication was "somewhat successful," although she hoped to "feel less confused and more focused." (Tr. 555.) On examination, Ms. Cockfield noted average

10

activity, well groomed appearance, average eye contact, circumstantial speech, full affect, cooperative behavior, logical thought process and good insight/judgment. (Tr. 555.) She also found impaired concentration and memory; auditory hallucinations; and a depressed, anxious, and cycling mood. (*Id.*)

On that same day, Reeves also presented to PPBH counselor Erin Boling, B.A. (Tr. 550-552.) She complained of racing thoughts, difficulty focusing, and agitation around groups of people. (Tr. 550.) Ms. Boling noted average activity, avoidant eye contact, clear speech, no cognitive impairment, appropriate and incongruent affect, euthymic mood, and fair insight and judgment. (Tr. 550-551.)

The following week, Reeves presented to Tiffany Harrison at PPBH for medication management. (Tr. 548-549.) She indicated her mood was "okay" and her medication was "working for her." (*Id.*) Examination findings were normal aside from anxious mood and racing thoughts. (*Id.*) Several weeks later, on June 27, 2016, Reeves reported a recent incident where she felt overwhelmed by small tasks, causing "overwhelming anxiety similar to a phobia." (Tr. 545.)

On July 5, 2016, Reeves returned to Ms. Cockfield. (Tr. 542.) She indicated her medications were helping to decrease crying spells and "angry outbursts." (*Id.*) Examination findings were normal aside from guarded behavior, anxious mood, and fair insight/judgment. (*Id.*)

On August 30, 2016, Reeves reported she had been out of her medication for the past two weeks and had noticed an increase in mood lability. (Tr. 539.) On examination, Ms. Boling noted depressed mood, appropriate affect, cooperative behavior, and fair insight/judgment. (Tr.

540.)  The following day, Reeves complained of depression and "some fleeting thoughts of self harm."  (Tr. 536.)  She also reported a recent episode of frustration during which she "thrashed around in her room" and ended up injuring herself.  (*Id.*)  Examination findings were normal aside from constricted/blunted affect and depressed mood.  (Tr. 536-537.)  Reeves was re-started on Lamictal and Wellbutrin.  (Tr. 537.)  Shortly thereafter, on September 8, 2016, Reeves reported her mood was "better," denied "any issues," and indicated her "medication is working for her." (Tr. 534.)

 On September 28, 2016, however, Reeves stated she was depressed and did not want to leave her house.  (Tr. 532.)  On examination, Ms. Harrison noted average activity, clear speech, average eye contact, full affect, cooperative behavior, anxious and depressed mood, racing thoughts, and good insight/judgment.  (*Id.*)

The following month, on October 25, 2016, Reeves reported an increase in anxiety and depression symptoms.  (Tr. 609.)  She indicated that she continued to take on "the majority of housework," including caring for her housemate's dogs.  (*Id.*)  Examination findings were largely normal aside from tangential thought process.  (Tr. 609-610.)  Several days later, Reeves reported an anxious mood and reported she was not sleeping well.  (Tr. 607.)

After missing several appointments (Tr. 605, 606), Reeves returned to Ms. Cockfield on November 22, 2016.  (Tr. 602-604.)  She indicated that "she has continued to have periods of depression and periods of hypomania where she gets many things done." (Tr. 602.)  Reeves reported "she continues to live low demand lifestyle venturing out little." (*Id.*)  Examination findings were normal aside from anxious and cycling mood.  (*Id.*)  Ms. Cockfield increased Reeves' Lamictal dosage and continued her on Wellbutrin.  (Tr. 603.)

On December 15 and 29, 2016, Reeves reported she was anxious but nonetheless stated her medication was "working for her." (Tr. 599, 597.) Examination findings on both dates were normal aside from an anxious mood and racing thoughts. (*Id*.)

On January 10, 2017, Reeves reported sleep problems and depression, which she rated a 5 on a scale of 10. (Tr. 594.) She stated she "doesn't like to go out in public unless she is with her [boyfriend]." (*Id*.) Examination findings were normal aside from anxious and depressed mood, and tangential thought process. (*Id*.) Later that month, Reeves' mood was "okay" and she was sleeping better. (Tr. 592.) Ms. Harrison noted irritable mood and racing thoughts. (*Id*.)

In February 2017, Reeves indicated her mood was "up and down." (Tr. 589.) She reported that "she has these periods where she sees shadows that aren't really there, and one night she woke up and punched herself in the leg." (*Id*.) Nonetheless, Reeves stated her medication was "working for her." (*Id*.)

The following month, Reeves reported "stress at home with completing housework and taking care of the four dogs." (Tr. 585.) She indicated she had been eating marijuana-infused butter to treat her social anxiety. (*Id*.) On examination, Ms. Boling noted a flat affect, avoidant eye contact, euthymic mood, poor insight, fair judgment, and tangential thought process. (Tr. 585-586.) At a subsequent visit later that month, Reeves reported a manic mood but stated she was sleeping "okay." (Tr. 583.) Ms. Harrison noted racing thoughts and a euphoric mood, but also found good insight and judgment, clear speech, full affect, and cooperative behavior. (*Id*.)

On May 2, 2017, Reeves established care with primary care physician Naomi Tyree, M.D. (Tr. 627-632.) She reported that Lamictal helped with her mood swings, and Wellbutrin "helps with mood, energy, [and] social anxiety." (Tr. 628.) Reeves complained, however, of

difficulty falling asleep and panic attacks that cause "an inability to think and act" and an "aggressive feeling." (*Id.*) She also reported "general confusion" and indicated it was hard to get up in the morning. (Tr. 630.) On examination, Dr. Tyree noted Reeves' mood and affect were normal, and that "cutting marks well healed to [lower left] abdomen." (Tr. 631.)

On June 8, 2017, Reeves returned to therapist Ms. Boling with complaints of frustration with being asked to babysit for her boyfriend's son. (Tr. 614.) On examination, Ms. Boling noted flat affect, cooperative behavior, euthymic mood, fair insight/judgment, and logical thought process. (*Id.*)

On August 24, 2017, Reeves' mental health providers at PPBH (Ms. Cockfield, Ms. Boling, and supervising counselor Sean Blake) completed a joint Medical Source Assessment (Mental). (Tr. 692-694.) They opined Reeves would have noticeable difficulty more than 20% of the workday or work week (i.e., more than 1 hours and up to 2 hours/day, or ½ to 1 day/week) performing the following activities: (1) remembering locations and work-like procedures; (2) understanding, remembering, and carrying out very short and simple instructions; (3) understanding, remembering, and carrying out detailed instructions; (4) maintaining attention and concentration for extended periods of time; (5) working in coordination with or proximity to others without being distracted by them; (6) making simple work-related decisions; (7) completing a normal workday and workweek without interruptions from psychologically based symptoms and performing at a consistent pace without an unreasonable number and length of rest periods; and (8) interacting appropriately with the general public. (*Id.*) These providers further found Reeves was not able to travel in unfamiliar places or use public transportation on a regular, reliable, or sustained schedule. (Tr. 693.)

Ms. Cockfield, Ms. Boling, and Mr. Blake opined Reeves would likely be absent from work as a result of her impairments or treatment more than four days per month, and would be off task over 20% of the workday due to her mental health symptoms. (Tr. 693.) They also concluded Reeves would need to take unscheduled breaks more than four times per day, and that each break would typically last 15 minutes to an hour. (*Id.*) Finally, Ms. Cockfield, Ms. Boling, and Mr. Blake explained the medical findings that supported their opinion as follows:

> Client reports significant nervousness, fear, and irritability that interfere with her ability to interact appropriately with others and with her ability to complete tasks at work. She has difficulty tolerating distress and occasionally engages in self-injurious behaviors when she is overwhelmed. Client relies significantly on her partner and has difficulty completing tasks, such as grocery shopping, without assistance. She also reports memory impairments and difficulty with concentration that hinder her ability to remember and follow instructions, as well as impede decision making.

(Tr. 694.)

## C.   State Agency Reports

On February 1, 2016, state agency psychologist Sandra Banks, Ph.D., reviewed Reeves' medical records and completed a Psychiatric Review Technique ("PRT") and Mental Residual Functional Capacity ("RFC") Assessment. (Tr. 77-81.) In the PRT, Dr. Banks concluded Reeves had moderate restrictions in her activities of daily living, maintaining social functioning, and maintaining concentration, persistence, and pace. (Tr. 77.) In the Mental RFC, Dr. Banks found she was moderately limited in her abilities to (1) understand, remember, and carry out detailed instructions; (2) maintain attention and concentration for extended periods; (3) make simple work-related decisions; (4) interact appropriately with the general public; (5) accept instructions and respond appropriately to criticism from supervisors; (6) get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and (7) respond

appropriately to changes in the work setting. (Tr. 78-80.) In the narrative section of the report, Dr. Banks explained as follows:

> The claimant can be expected to understand, remember and carry out simple, one and two-step instructions. She is able to maintain concentration and attention for routine tasks. She would be able to maintain regular attendance. She can work within a designated schedule. She would not require special supervision in order to sustain a basic, repetitive routine. She can be expected to perform the personal care functions needed to maintain an acceptable level of personal hygiene. The claimant can sustain an ordinary routine and adapt to routine changes without special supervision. She can complete production-oriented tasks requiring little independent decision making.
>
> The limitations resulting from the impairments do not preclude the claimant from performing the basic mental demands of competitive tasks on a sustained basis.
>
> Based on the evidence of record, the claimant's statements are found to be partially credible. The GAF score(s) in file have been considered and are given appropriate weight in this assessment.

(Tr. 80.)

On April 20, 2016, state agency psychologist Audrey Todd, Ph.D., reviewed Reeves' medical records and completed a PRT and Mental RFC. (Tr. 111-114.) Dr. Todd reached the same conclusions as Dr. Banks. (*Id*.)

**D.      Hearing Testimony**

During the September 7, 2017 hearing, Reeves testified to the following:

- She lives in a single room apartment in the basement of a "triplex." (Tr. 32.) Her boyfriend lives on the first floor with his four dogs. (Tr. 32, 47-48.) Her boyfriend's daughter lives on the third floor. (Tr. 49.) She completed high school and attended college "on and off" between 2008 and 2013, where she studied fine arts. (Tr. 34.) She has no vocational training. (Tr. 35.)

- She has never had a driver's license. (Tr. 33.) She does not drive because she gets anxious "very easily" and experiences "panic attacks being on the road." (*Id*.) She does not take public transportation. (*Id*.) Her boyfriend takes her everywhere she needs to go. (*Id.*)

16

- She has never worked full time, but has held a series of part time positions. (Tr. 35.) She worked 15 to 30 hours per week at Circuit City as a stocker. (Tr. 36.) She did not work full time because she "just didn't want to be there, like at all." (Tr. 37.) After Circuit City was liquidated, she worked part time at Home Depot as a cashier. (Tr. 38.) She was fired from this position because she missed a lot of work and was chronically late. (Tr. 39.) She explained that she did not want to go to work because she felt overwhelmed and "just didn't want to leave the house." (*Id*.) She did not like dealing with strangers and being forced to talk to people. (*Id*.) She then worked part time at an arts and crafts store as a cashier and stocker. (Tr. 40-41.) She had problems talking to people and completing tasks. (Tr. 50.) She mostly hid in the back room or restroom. (*Id*.) Her therapist advised her to leave this job because it was causing too much unhealthy stress. (Tr. 42.)

- She explained why believes she cannot work full time, as follows: "I don't consider myself mentally stable. I get mood swings by the hour and I can't focus, I can't concentrate. I have zero confidence in following instruction. It takes me hours to do a simple task and I mean, I melt down over just really small things." (Tr. 43.) She is anxious, has trouble concentrating, and experiences crying spells and "wailing fits." (Tr. 57-59.) She described "intrusive thoughts" and episodes where she paces and her "mind is just going and going." (Tr. 59-60.) Most days she cannot even step out of her room. (Tr. 62.)

- She was psychiatrically hospitalized in 2009 and 2013. (Tr. 44.) She still has suicidal thoughts once per week. (Tr. 54-55.) She used to cut herself but that has "lessened." (Tr. 46.) She still hurts herself, however, by hitting her head into things, burning herself, and using a chain on her neck. (*Id*.) In 2017, she punched herself in the jaw and left a big bruise. (*Id*.) The pain "calms her down." (Tr. 56.)

- She has daily crying spells. (Tr. 56.) About "once every week or two," she experiences "wailing fits," during which she screams, thrashes around, and throws things. (Tr. 57-58.) She also experiences "melt downs" "every couple of days." (Tr. 50-51.) Afterwards, she feels "a lot of guilt and confusion." (Tr. 51.) She feels horrible every day and is "literally just tired of everything." (Tr. 54.)

- She stopped attending college because of social anxiety and an inability to complete tasks. (Tr. 60.) She would like to go back but is terrified. (Tr. 52.) When asked what terrifies her, she explained: "Just the people, the people and just being expected to do those things and I desperately want to but I'm just so scared." (*Id*.) She is also afraid to go back to school because she gets anxious about deadlines and feels unable to get her work done in a timely manner. (*Id*.)

She has difficulty completing tasks because she alternates between feeling manic, depressed, and anxious, and then she "just start[s] crying." (*Id.*)

• Her treatment between 2009 and 2016 was "spotty" because she had difficulty getting to her therapist's and psychiatrist's offices. (Tr. 45.) She was still, however, prescribed medication, which was "extremely" helpful. (*Id.*) She also consumes marijuana occasionally because it "helps her leave the house." (Tr. 43, 61.) She does not really drink alcohol much anymore but, in the days leading up to her psychiatric hospitalizations, she drank excessively. (Tr. 44.)

• With regard to her daily activities, she vacuums a couple times per week, and goes grocery shopping with her boyfriend every couple of weeks. (Tr. 47-49.) She sometimes feeds the dogs, but has problems doing this because it requires her to leave her room. (Tr. 53.) She occasionally helped babysit her boyfriend's daughter, but he prefers to pay for a babysitter because of her (Reeves') mood swings. (Tr. 49.) She likes to watch movies and read. (Tr. 48.) She does art projects when she feels up to it, but "a lot of it is unfinished." (*Id.*) She does not go anywhere without her boyfriend, and does not really have any friends. (Tr. 49.) She spends a lot of time in her room. (Tr. 48.)

The ALJ determined Reeves had no past relevant work for purposes of social security regulations. (Tr. 41, 65.) The ALJ then posed the following hypothetical question:

Assume a hypothetical individual with the claimant's education and age and no past relevant work. Assume the individual has non exertional limitation and can perform simple, routine tasks which would require little independent decision making in an environment free of fast paced production requirements and involving few work place changes. The individual can have occasional superficial interaction with supervisors, coworkers and the general public, meaning no tasks involving arbitration, negotiation, confrontation, directing the work of others, persuading others or being responsible for the safety or welfare of others. Could the hypothetical individual perform any work and if so, could you give me a few examples of numbers of jobs in the national economy?

(Tr. 65-66.) The VE testified the hypothetical individual would be able to perform representative jobs in the economy, such as laundry worker (medium, unskilled, SVP 2); small industrial cleaner (medium, unskilled, SVP 2); and packager (medium, unskilled, SVP 2). (Tr. 66-67.)

18

The ALJ then asked the VE to consider the above hypothetical but with the limitation that the individual could have no contact with the general public. (Tr. 67.) The VE testified the hypothetical individual could perform the previously identified jobs of laundry worker, small industrial cleaner, and packager. (*Id*.)

The ALJ then asked the VE regarding employer tolerance for off task behavior and absences. (Tr. 67-68.) The VE testified employers would not tolerate "off task behavior equal to or greater than 20% in a day, on average, over time." (*Id.*) With regard to absences, the VE testified there would be no work for an individual who is absent two or more days per month. (Tr. 68.)

Reeves' counsel then asked "if we took hypothetical number one and then changed that so that there was no interaction, not just with the general public but also with supervisors and coworkers, would they be able to maintain the jobs you've identified or other unskilled jobs?" (Tr. 68.) The VE testified there would not be any competitive work for such a hypothetical individual. (Tr. 68-69.)

Reeves counsel then asked "if we were to take hypothetical number one but add to it that once a week the individual would have an emotional outburst which would be an anger fit or a crying spell and then they would react physically to crying in front of others or anger to the point of throwing something or hitting something, would they be able to maintain employment?" (Tr. 69.) The VE testified there would not be any competitive work for such a hypothetical individual. (Tr. 69.)

Reeves' counsel asked the VE to assume the first hypothetical "but add to it in addition to the scheduled breaks, which I think is 15 minutes in the morning, a half hour or so for lunch and

15 minutes or so in the afternoon, that the individual would need an additional four unscheduled breaks lasting 15 minutes at a time. Essentially in order to calm herself down. Would they be able to maintain competitive employment?" (Tr. 69-70.) The VE against testified there would not be any competitive work for such a hypothetical individual. (Tr. 70.)

Lastly, Reeves' counsel asked "if I were to change it then and say . . . three times a week they would need a 15 minute unscheduled break, would that be too much?" (*Id*.) The VE testified that it would. (*Id*.)

### III.  STANDARD FOR DISABILITY

The Social Security Act mandates the satisfaction of three basic criteria to qualify for child's insurance benefits of an insured, namely, the child must: (1) have filed an application for such benefits; (2) have been unmarried at the time of the filing and must have been either: (i) under eighteen years of age or a full time elementary or secondary school student under nineteen, or (ii) under a disability which began before age 22; and (3) have been dependent upon the parent at the time the application was filed if the parent is still living or, if the parent is deceased, at the time of the parent's death. 42 U.S.C. § 402(d)(1).

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).

A claimant is entitled to a POD only if: (1) she had a disability; (2) she was insured when she became disabled; and (3) she filed while she was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process. 20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4). *See also Ealy v. Comm'r of Soc. Sec*., 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. §§ 404.1520(b) *and* 416.920(b). Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. §§ 404.1520(c) *and* 416.920(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbot*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. §§ 404.1520(d) *and* 416.920(d). Fourth, if the claimant's impairment or combination of impairments does not prevent him from doing his past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f) *and* 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

Here, Reeves was insured on her alleged disability onset date, March 15, 2009, and remained insured through December 31, 2017, her date last insured ("DLI.") (Tr. 19.) Therefore, in order to be entitled to POD and DIB, Reeves must establish a continuous twelve month period of disability commencing between these dates. Any discontinuity in the twelve month period precludes an entitlement to benefits. *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

## IV.    SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.     The claimant meets the insured status requirements of the Social Security Act through December 31, 2017.

2.     Born on July ** 1987, the claimant had not attained age 22 as of March 15, 2009, the alleged onset date (20 CFR 404.102 and 404.350(a)(2)).

3.     The claimant has not engaged in substantial gainful activity since March 15, 2009, the alleged onset date (20 CFR 404.1571 et seq.).

4.     Prior to attaining age 22, and since the alleged onset date, the claimant had the following severe impairments: bipolar disorder, generalized anxiety disorder, and substance addiction disorder (20 CFR 404.1520(c) and 416.920(c)).

5.     Prior to attaining age 22, and since the alleged onset date, the claimant has not had an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926).

6.     After careful consideration of the entire record, the undersigned finds that, prior to attaining age 22, and since the  alleged onset date, the claimant had the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: The claimant can perform simple, routine tasks which require little independent decision making in an environment free of fast-paced production requirements and involving few workplace changes. The claimant can have only occasional and superficial interaction with supervisors, coworkers, and

the public. This means that the claimant cannot participate in any type of arbitration, negotiation, confrontation, directing the work of others, persuading others, or being responsible for the safety or welfare of others.

7.      The claimant has no past relevant work (20 CFR 404.1565 and 416.965).

8.      The claimant was born on July ** 1987 and was 21 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

9.      The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

10.     Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 404.1568 and 416.968).

11.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

12.     The claimant has not been under a disability, as defined in the Social Security Act, from the alleged onset date (and prior to turning 22) through the date of this decision (20 CFR 404.350(a)(5), 404.1520(g), and 416.920(g)).

(Tr. 12-20.)

## V. STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 2011 WL 1228165 at * 2 (6th Cir. April 1, 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v.*

*Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999)("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.") This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.,White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld

where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.1996); accord *Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI.  ANALYSIS

### *Credibility/Evaluation of Subjective Symptoms*

In her first assignment of error, Reeves argues the ALJ "failed to state valid reasons and lacked substantial evidence for finding that [her] subjective allegations were inconsistent with the record."  (Doc. No. 13 at 16-22.)  She maintains the ALJ's stated reasons for discounting the severity of her symptoms (i.e., her "full range" of daily activities and "largely normal" mental status exams) are not supported by the record.  (*Id*.)  With regard to her daily activities, Reeves argues the ALJ fails to acknowledge that she has considerable difficulty performing daily activities, noting evidence that she wears dirty clothes, does not bathe at times, goes over a week without washing her hair, does not eat when depressed or anxious, and takes considerable time to cook meals due to lack of energy and anxiety.  (*Id*.)  Reeves also asserts that, although she

25

worked part time during the relevant time period, she was often late due to her fear of leaving the house, frequently left her workstation to hide in the bathroom, ignored customers, and cried on the sales floor. (*Id*.) With regard to her mental status examinations, Reeves argues the ALJ cherry picked the evidence by ignoring the many abnormal exam findings in the record. (*Id*.)

The Commissioner argues the ALJ reasonably evaluated Reeves' subjective complaints. (Doc. No. 15 at 11-15.) She asserts the ALJ considered a "multitude of factors," including the consistency of Reeves' symptoms with the objective medical record, Reeves' own statements regarding her symptoms and response to treatment, and her activities of daily living. (*Id*.) In this regard, the Commissioner notes that, Reeves' treating clinicians routinely noted normal examination findings, including "full orientation, intact memory, adequate concentration, appropriate grooming, friendly/cooperative behavior, appropriate thought content, and appropriate affect." (*Id*. at 12.) She also cites treatment records documenting Reeves' own statements that her medication was working well for her. (*Id*. at 13.) Finally, the Commissioner argues that "the ALJ reasonably found that the Plaintiff's daily activities, limited as they were, were not consistent with her allegations of debilitating mental symptoms." (*Id*. at 14.)

When a claimant alleges symptoms of disabling severity, an ALJ must follow a two-step process for evaluating these symptoms. *See e.g, Moore v. Comm'r of Soc. Sec.,* 573 Fed. Appx. 540, 542 (6th Cir. Aug. 5, 2014); *Massey v. Comm'r of Soc. Sec*., 2011 WL 383254 at * 3 (6th Cir. Feb. 7, 2011). First, the ALJ must determine if there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce a claimant's symptoms. Second, the ALJ "must evaluate the intensity and persistence of [the claimant's] symptoms so that [the ALJ] can determine how [those] symptoms limit [the

claimant's] capacity for work."  20 C.F.R. § 404.1529(c)(1).  *See also* SSR 16-3p,[6] 2016 WL

1119029 (March 16, 2016).

If the claimant's allegations are not substantiated by the medical record, the ALJ must

evaluate the individual's statements based on the entire case record.  The evaluation of a

claimant's subjective complaints rest with the ALJ.  *See Siterlet v. Sec'y of Health & Human*

*Servs.*, 823 F.2d 918, 920 (6th Cir. 1987); *Rogers*, 486 F.3d at 248 ("noting that "credibility

determinations regarding subjective complaints rest with the ALJ").  The ALJ's findings are

entitled to considerable deference and should not be discarded lightly.  *See Villareal v. Sec'y of*

*Health & Human Servs.*, 818 F.2d 461, 463 (6th Cir. 1987).  Nonetheless, the ALJ's "decision

must contain specific reasons for the weight given to the individual's symptoms ... and be clearly

articulated so the individual and any subsequent reviewer can assess how the adjudicator

evaluated the individual's symptoms"  SSR 16-3p, 2016 WL 1119029; *see also Felisky v. Bowen*,

35 F.3d 1027, 1036 (6th Cir. 1994) ("If an ALJ rejects a claimant's testimony as incredible, he

must clearly state his reason for doing so").

In evaluating a claimant's symptoms, the ALJ must look to medical evidence,

statements by the claimant, other information provided by medical sources, and any other

relevant evidence on the record.  Beyond medical evidence, there are seven factors that the ALJ

should consider.[7]  The ALJ need not analyze all seven factors, but should show that he

---

[6]     SSR 16-3p superceded SSR 96-7p, 1996 WL 374186 (July 2, 1996) on March 28,
        2016.  Thus, SSR 16-3 was in effect at the time of the September 2017 hearing.

[7]     The seven factors are: (1) the individual's daily activities; (2) the location,
        duration, frequency, and intensity of the individual's pain; (3) factors that
        precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and
        side effects of any medication the individual takes or has taken to alleviate pain or

considered the relevant evidence.  *See Cross v. Comm'r of Soc. Sec.*, 373 F. Supp.2d 724, 733

(N.D. Ohio 2005); *Masch v. Barnhart*, 406 F. Supp.2d 1038, 1046 (E.D. Wis. 2005).

Here, the ALJ acknowledged Reeves' complaints of anxiety, rapid mood cycling, racing

thoughts, social phobia, paranoia, and depression, as well as her allegations that she experiences

difficulty talking, remembering and completing tasks, concentrating, and getting along with

others.  (Tr. 17)  After discussing the medical and opinion evidence at length, the ALJ found

Reeves' medically determinable impairments could reasonably be expected to cause her alleged

symptoms; "however, [her] statements concerning the intensity, persistence, and limiting effects

of these symptoms are not entirely consistent with the medical evidence and other evidence in

the record for the reasons explained in this decision." (*Id.*)  Specifically, the ALJ found that

Reeves' statements regarding her symptoms were "inconsistent with the claimant's full range of

daily activity," noting that she currently lives independently, is able to care for her personal

hygiene, enjoys cooking, has been able to work part-time throughout most of the period of

adjudication, and is able to attend medical appointments and shop for groceries.  (*Id.*)  The ALJ

further found that, although treatment records noted some abnormal examination findings,

Reeves was consistently described as fully oriented with good grooming, cooperative and/or

friendly behavior, normal eye contact, normal psychomotor activity, normal speech, normal

---

other symptoms; (5) treatment, other than medication, the individual receives or
has received for relief of pain or other symptoms; (6) any measures other than
treatment the individual uses or has used to relieve pain or other symptoms; and
(7) any other factors concerning the individual's functional limitations and
restrictions due to pain or other symptoms.  *See* SSR 16-3p, 2016 WL 1119029 at
* 7.

thought content, good insight, and intact memory. (Tr. 17-18.) The ALJ also noted Reeves'

reports that she "feels her medicine is working well for her." (Tr. 18.)

Based on the above, the ALJ determined "there is nothing in the record that justifies any

further reduction in the residual functional capacity contained herein." (*Id*.) The ALJ

formulated the following RFC:

> After careful consideration of the entire record, the undersigned finds that, prior to attaining age 22, and since the alleged onset date, the claimant had the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: The claimant can perform simple, routine tasks which require little independent decision making in an environment free of fast-paced production requirements and involving few workplace changes. The claimant can have only occasional and superficial interaction with supervisors, coworkers, and the public. This means that the claimant cannot participate in any type of arbitration, negotiation, confrontation, directing the work of others, persuading others, or being responsible for the safety or welfare of others.

(Tr. 16.)

Reviewing the decision as a whole, the Court finds substantial evidence supports the

ALJ's evaluation of Reeves' subjective symptoms. As noted above, the ALJ discounted the

severity of Reeves' symptoms, in part, on the basis that her allegations were inconsistent with

the medical evidence; i.e., the normal examination findings in her treatment records and her

positive response to treatment. Specifically, the ALJ explained as follows:

> Turning to the treatment record, the claimant sought sporadic mental health care at Pan American Behavioral Health Clinic from 2010 through 2015. At these few appointments, mental status examinations ("MSE"s) often report a depressed, anxious, or irritable mood. However, they also consistently report full[] orientation, friendly behavior, normal psychomotor activity, normal speech, appropriate thought content, good insight, and an intact remote and recent memory. (Exhibits B3F and B7F)
>
> Since 2016, the claimant has received regular mental health treatment at Portage Path Behavioral Health ("PPBH"). A psychiatric assessment administered on May 24, 2016 revealed an anxious mood and somewhat rambling speech. However, it

also revealed good grooming, cooperative behavior, normal speech, full orientation, an appropriate affect, a normal thought process, adequate concentration, and fair insight and judgment. (Exhibit 8F28-41) On July 5, 2016, an MSE revealed a normal mental status - including mood and speech. (Id. at 12-13) In August 2016, the claimant's mood was depressed but her mental status was otherwise within normal limits. (Id. at 9-10)

On November 22, 2016, the claimant presented to PPBH complaining of intermittent periods of depression and mania. Aside from an impaired mood, her mental status was normal. She had normal psychomotor activity, average eye contact, and clear speech. (Id. at 2) An MSE administered in March 2017 revealed average motor activity, good grooming, average eye contact, clear speech, a full affect, cooperative behavior, a euphoric mood, full orientation, and good insight and judgment. The claimant reported that she feels her medicine is working well for her. (Exhibit B10F5) Finally, aside from a flat affect, the claimant's mental status was within normal limits on June 9, 2017. (Exhibit B11F)

(Tr. 17-18.)

The ALJ's reasoning is supported by substantial evidence. It is true that Reeves' mental health providers often noted abnormal examination findings, including an anxious, depressed, and/or angry mood, irritability, mood swings, racing thoughts, constricted affect, circumstantial thought process, and (occasionally) impaired concentration. However, the ALJ correctly found that Reeves' providers also consistently documented a host of normal mental status examination findings, including full orientation, cooperative behavior, good eye contact, normal psychomotor activity, normal speech, intact memory, adequate concentration, appropriate thought content, and fair to good insight/judgment. (Tr. 458, 453, 450-451, 447-448, 444, 423, 569, 550-551, 548-549, 542, 536-537, 532, 609-610, 602, 599, 597, 594, 583, 631, 614.) Moreover, substantial evidence supports the ALJ's conclusion that Reeves' medicine was "working well for her" and that she improved with medication and treatment. In October 2014, after receiving regular treatment and medication from Dr. Mufson, Reeves felt "less depressed" and was "feeling well." (Tr. 447, 433.) At that time, Dr. Mufson assessed a GAF of 60,

indicating moderate impairment. (Tr. 447-448.) In March and April 2015, Reeves reported her medication was working and she was described as stable with treatment. (Tr. 430, 429.) Several months later, Dr. Mufson again assessed a GAF of 60. (Tr. 445.) In October 2015, Reeves reported: "my medication is working fine; I feel great, [and] I have no complaints." (Tr. 427.)

The following year, Reeves indicated that her medication "really makes a difference." (Tr. 558.) Indeed, in June and July 2016, Reeves reported to her PPBH providers that her medication was "working for her" and helping to decrease crying spells and "angry outbursts." (Tr. 548-549, 542.) In September 2016, Reeves reported her mood was "better," denied "any issues," and indicated her "medication is working for her." (Tr. 534.) While Reeves reported exacerbations in her depression and anxiety over the next six months, she reported to Dr. Tyree in May 2017 that Lamictal helped with her mood swings and Wellbutrin "helps with mood, energy, and social anxiety." (Tr. 628.)

The Court acknowledges there is medical evidence in the record that might support Reeves' argument. However, the ALJ's findings herein are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion. *See Buxton*, 246 F.3d at 772-3; *Her*, 203 F.3d at 389-90. Here, for the reasons discussed above, the Court finds the ALJ's conclusion that Reeves' reported symptoms are inconsistent with the objective medical evidence is supported by substantial evidence in the record.

The Court is not as persuaded, however, by the ALJ's reliance on Reeves' "full range of daily activities" to discount her allegations of disabling mental health symptoms. As noted above, the ALJ found Reeves' statements about the intensity, persistence, and limiting effects of her symptoms were inconsistent with her daily activities, explaining as follows:

31

> The claimant currently lives independently in an apartment. She is able to care for her personal hygiene and dress herself. The claimant enjoys cooking and considers it a hobby. The claimant has stated that she avoids leaving the house due to paranoia, but she has been able to work part-time throughout most of the period of adjudication and she is able to attend medical appointments and shop for groceries. (Exhibits B5E, B6E, B15E, and hearing testimony).

(Tr. 17.) While these daily activities might normally support an ALJ's credibility assessment under certain circumstances, the Court agrees with Reeves that the ALJ herein failed to accurately characterize her ability to actually perform the activities noted.

For example, the ALJ first states that Reeves "is able to care for her personal hygiene and dress herself." (Tr. 17.) However, the ALJ fails to either acknowledge or address the fact that Reeves reported she often forgets to bathe when depressed, usually goes over a week without washing her hair, fails to eat if "too depressed or anxious," and "hold[s] in my urine or my bowels until I have the courage to go to the bathroom or I'll urinate somewhere in my room." (Tr. 331.) Moreover, while the ALJ states Reeves "enjoys cooking," the decision fails to acknowledge or address Reeves' statements that "the courage and energy its takes [to cook] is tremendous and can take up the whole night." (Tr. 332.) The ALJ also fails to address the fact that, while Reeves worked part-time for part of the relevant time period, she was fired from one job because of frequent absences due to her depression and social anxiety; and was encouraged by her therapist to quit her other job due to the stress it causing her. (Tr. 39, 42.) The decision also fails to acknowledge Reeves' statements that, while working, she would "often find excuses or just leave to go hide in the bathroom or breakroom," would leave isles or attempt to ignore shoppers, and would "find myself talking aloud to myself or crying on the sales floor if I think I'm alone." (Tr. 330.) Finally, the Court questions whether it was appropriate for the ALJ to essentially penalize Reeves because she was able to attend medical appointments.

Nonetheless, even assuming the ALJ erred in her consideration of Reeves' activities of daily living, a review of the decision makes clear she did not solely rely on evidence regarding this issue in evaluating Reeves' subjective symptoms. To the contrary, and as noted above, the ALJ also considered numerous other factors, including the consistency of Reeves' allegations with the objective medical evidence, the effectiveness of the medication Reeves takes to alleviate her symptoms, and treatment other than medication (such as counseling and therapy) that Reeves has received to address her mental health symptoms. Moreover, as the Commissioner correctly notes, the ALJ did not totally discount Reeves' testimony and statements regarding the severity of her symptoms. Rather, the ALJ expressly acknowledged her symptoms and included a number of mental restrictions in the RFC to address them, including limitations to simple, routine tasks with little independent decision making, no fast-paced production requirements, few workplace changes, and occasional and superficial interaction with supervisors, coworkers, and the public.

In sum, consistent with SSR 16-3p, the ALJ properly considered the entire record and found Reeves' allegations were not fully credible. Under these circumstances, remand is not required. *See Johnson v. Comm'r of Soc. Sec*., 535 Fed. Appx. 498, 507 (6th Cir. 2013) ("[E]ven if an ALJ's adverse credibility determination is based partially on invalid reasons, harmless error analysis applies to the determination, and the ALJ's decision will be upheld as long as substantial evidence remains to support it.") (citing *Ulman v. Comm'r of Soc. Sec*., 693 F.3d 709, 714 (6th Cir.2012)). Reeves' argument to the contrary is without merit.

### *Opinion of Reeves' Mental Health Providers*

Reeves next argues the ALJ failed to properly evaluate the August 2017 opinion submitted by treating counselor Erin Boling, psychiatric clinical nurse specialist Kathy Cockfield, and supervising counselor Sean Blake. (Doc. No. 13 at 22-25.) She maintains the ALJ improperly discounted this opinion on the basis that it relied on Reeves' subjective complaints, where the medical evidence supports the severity of her alleged symptoms. (*Id.*) Reeves further asserts that "the mental status exams do not serve as a proper basis for discrediting the opinions of [these] providers, and the ALJ's analysis of the same misstates, underestimates, and ignores many of the significant supportive findings." (*Id.*)

The Commissioner argues the ALJ reasonably evaluated the August 2017 opinion from Reeves' mental health providers. (Doc. No. 15 at 15-18.) She first notes these providers are not "acceptable medical sources" and, therefore, the ALJ was not required to articulate "good reasons" for rejecting their opinion. (*Id.*) The Commissioner further asserts the ALJ nonetheless thoroughly evaluated the opinion and provided a reasonable basis for discounting it, including its inconsistency with Reeves' treatment records. (*Id.*)

Under Social Security Regulations, clinical nurse specialists and mental health counselors are not "acceptable medical sources" entitled to the type of "controlling weight" an "acceptable medical source" enjoys. *See* 20 C.F.R §§ 416.902(a)(1) - (8), 416.927(a)(1), 416.927(f). *See also Dunmore v. Colvin*, 940 F.Supp.2d 677, 685 (S.D. Ohio 2013) (mental health therapist is not an "acceptable medical source"); *Caywood v. Comm'r of Soc. Sec.*, 2018 WL 4932501 at * 8 (N.D. Ohio July 27, 2018) ("nurses and counselors are not 'acceptable medical sources' under the regulations"); *Dudich v. Colvin*, 2013 WL 5939775 at *10 (N.D. Ohio Nov. 5, 2013) (clinical nurse specialist not among list of "acceptable medical sources"

entitled to deference under the treating physician rule).  However, the regulations provide these opinions must still be considered, using the same factors listed in 20 C.F.R. §416.927(c).  The regulations further provide "not every factor for weighing opinion evidence will apply in every case" and the "adjudicator generally should explain the weight given to opinions from these source or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicators's reasoning."  20 C.F.R. §416.927(f)(1)-(2).

Social Security Ruling 06-03p[8] further explains how opinion evidence from "other sources" should be treated.  SSR 06-03p provides information from "other sources" (such as mental health counselor or clinical nurse specialist) is "important" and "may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function."  SSR 06-03p, 2006 WL 2329939 at *2-3 (SSA Aug. 9, 2006).  Interpreting this SSR, the Sixth Circuit has found opinions from "other sources" who have seen the claimant in their professional capacity "should be evaluated using the applicable factors, including how long the source has known the individual, how consistent the opinion is with other evidence, and how well the source explains the opinion."  *Cruse v. Comm'r of Soc. Sec.,* 502 F.3d 532, 541 (6th Cir. 2007) ("Following SSR 06-03p, the ALJ should have discussed the factors relating to his treatment of Hasselle's assessment, so as to have provided some basis for why he was rejecting the opinion").  *See also Williams v. Colvin,* 2017 WL 1074389 at *3 (N.D. Ohio March 22, 2017).

---

[8]   The Court notes SSR 06-03p was rescinded on March 27, 2017.  This rescission is effective for claims filed on or after March 27, 2017.  *Rescission of SSRs 96-2p, 96-5p, and 06-03p,* 2017 WL 3928298 at *1 (SSA March 27, 2017).  As Reeves' applications were filed in December 2015, the Court applies the regulations and rulings in effect at that time.

Here, Ms. Cockfield, Ms. Boling, and Mr. Blake completed a joint Medical Source Assessment regarding Reeves' mental health limitations on August 24, 2017.  (Tr. 692-694.) Therein, they opined Reeves would have noticeable difficulty more than 20% of the workday or work week performing the following activities: (1) remembering locations and work-like procedures; (2) understanding, remembering, and carrying out very short and simple instructions; (3) understanding, remembering, and carrying out detailed instructions; (4) maintaining attention and concentration for extended periods of time; (5) working in coordination with or proximity to others without being distracted by them; (6) making simple work-related decisions; (7) completing a normal workday and workweek without interruptions from psychologically based symptoms and performing at a consistent pace without an unreasonable number and length of rest periods; and (8) interacting appropriately with the general public.  (*Id.*)  These providers further found Reeves was not able to travel in unfamiliar places or use public transportation on a regular, reliable, or sustained schedule.  (Tr. 693.)

Ms. Cockfield, Ms. Boling, and Mr. Blake also opined Reeves would likely be absent from work as a result of her impairments or treatment more than four days per month, and would be off task over 20% of the workday due to her mental health symptoms.  (Tr. 693.)  They further concluded Reeves would need to take unscheduled breaks more than four times per day, and that each break would typically last 15 minutes to an hour.  (*Id.*)  Finally, Ms. Cockfield, Ms. Boling, and Mr. Blake explained the medical findings that supported their opinion as follows:

> Client reports significant nervousness, fear, and irritability that interfere with her ability to interact appropriately with others and with her ability to complete tasks at work.  She has difficulty tolerating distress and occasionally engages in self-injurious behaviors when she is overwhelmed.  Client relies significantly on her partner and has difficulty completing tasks, such as grocery shopping, without assistance.  She also

reports memory impairments and difficulty with concentration that hinder her ability to remember and follow instructions, as well as impede decision making.

(Tr. 694.)

The ALJ evaluated this opinion as follows:

Little weight is given to this opinion for several reasons. First, the claimant's therapist is not an acceptable medical source. Second, the opinion relies on the claimant's subjective complaints which, are not supported by the objective medical evidence. More specifically, the medical source statement asked "What are the medical findings which support your opinions?" The therapist's reply does not cite to treatment records, but begins with "Claimant reports significant nervousness, fear, and irritability ... ". The therapist also explains that the claimant "also reports memory impairments and difficulty with concentration that hinder her ability to remember and follow instructions ... ". As noted above, progress notes from PPBH consistently report normal memory and normal concentration. They report only occasional irritability. The opinions of the therapist and the claimant's subjective allegations are inconstant [sic] the objective medical evidence.

(Tr. 18.)

The Court finds the ALJ properly evaluated the August 2017 opinion of Ms. Cockfield, Ms. Boling, and Mr. Blake. The ALJ acknowledged these providers' findings and opinions and rejected them based on the following reasons: (1) neither Ms. Cockfield, Ms. Boling, or Mr. Blake are acceptable medical sources; (2) their opinion relies on Reeves' subjective complaints which are not supported by the medical record; and (3) their conclusions are inconsistent with Reeves' PPBH treatment records. (Tr. 18.) As noted *supra*, the ALJ is charged with generally explaining the weight given to opinions from other sources, or "otherwise ensur[ing] that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicators's reasoning." 20 C.F.R. §416.927(f)(1)-(2). The ALJ's discussion of the opinion complies with this regulation, as well as the factors set forth in SSR 06-03p.

Further, the ALJ's evaluation of the August 2017 opinion is supported by substantial evidence. As noted above, while it is true that Reeves' mental health providers often noted some abnormal examination findings, the ALJ correctly found Reeves' treatment records consistently documented a host of normal mental status examination findings, including full orientation, cooperative behavior, good eye contact, normal psychomotor activity, normal speech, intact memory, adequate concentration, appropriate thought content, and fair to good insight/judgment. (Tr. 458, 453, 450-451, 447-448, 444, 423, 569, 550-551, 548-549, 542, 536-537, 532, 609-610, 602, 599, 597, 594, 583, 631, 614.) Moreover, as discussed above, the record reflects Reeves improved with medication and regular treatment. (Tr. 447-448, 433, 429, 430, 445, 427, 558, 548-549, 542, 534.)

Finally, substantial evidence supports the ALJ's finding that the opinion of Ms. Cockfield, Ms. Boling, and Mr. Blake is inconsistent in certain respects with their own treatment records. Specifically, while these providers opined Reeves had memory and concentration impairments and would have significant difficulty maintaining attention and concentration, PPBH treatment records failed to consistently reflect these findings. For example, treatment notes from May 2016 expressly noted that Reeves had intact memory and adequate concentration. (Tr. 596.) Moreover, treatment records from June, August, September, October, November, and December 2016, and January, February, March and June 2017 failed to note any cognitive impairment and/or memory/concentration deficits. (Tr. 550, 537, 534, 532, 609-610, 602, 589-590, 594, 585, 614.)

Although Reeves cites evidence from the record she believes supports the August 2017 opinion, the findings of the ALJ "are not subject to reversal merely because there exists in the

record substantial evidence to support a different conclusion." *Buxton*, 246 F.3d at 772-73. Indeed, the Sixth Circuit has made clear an ALJ's decision "cannot be overturned if substantial evidence supports the claimant's position, so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). In this matter, the ALJ clearly articulated her reasons for discounting the August 2017 opinion and these reasons are supported by substantial evidence.

In sum, because Ms. Cockfield, Ms. Boling, and Mr. Blake are "other sources," the ALJ was not required to accord any particular weight to their opinion nor was she required to provide "good reasons" for rejecting it. Rather, the ALJ was required only to evaluate these providers' opinion using the applicable factors set forth in the regulations. *See Cruse*, 502 F.3d at 541. The Court finds the ALJ properly evaluated and discounted Ms. Cockfield, Ms. Boling, and Mr. Blake's August 2017 opinion for the reasons set forth above.

## VII. CONCLUSION

For the foregoing reasons, the Commissioner's final decision is AFFIRMED.

**IT IS SO ORDERED.**

_s/Jonathan D. Greenberg_
Jonathan D. Greenberg
United States Magistrate Judge

Date: April 30, 2019